**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| STEPHEN J. KINCAID, ) | |
| ) | CASE NO. 3:13-CV-02154 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE JACK ZOUHARY |
| ) | |
| ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security ) | **REPORT & RECOMMENDATION** |
| ) | |
| Defendant. ) | |

Plaintiff Stephen J. Kincaid ("Kincaid") challenges the final decision of the Acting Commissioner of Social Security, Carolyn Colvin ("Commissioner"), denying Kincaid's claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and the case REMANDED.

**I. Procedural History**

On July 31, 2009, Kincaid filed an application for SSI alleging a disability onset date of November 24, 2006. His application was denied both initially and upon reconsideration.

On November 15, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Kincaid, represented by counsel, and an impartial vocational expert ("VE") testified. On January 24, 2012, the ALJ found Kincaid was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 19-20) The ALJ's decision became final when the Appeals Council denied further review.

## II.  Evidence

*Personal and Vocational Evidence*

Age 24 at the time of his administrative hearing, Kincaid is a "younger" person under social security regulations.  *See* 20 C.F.R. § 416.963(c). Kincaid dropped out of high school after ninth grade, but subsequently earned his GED. (Tr. 48.) He previously had a job as a fast food worker, which the ALJ considered past relevant work.[1]  (Tr. 19.)

*Relevant Hearing Testimony*

At the hearing, Kincaid testified to the following:

- He stands 6'1" tall and weighs 375 pounds. (Tr. 46.) His weight can fluctuate "15 pounds either way usually." *Id.*

- He has lived in a mobile home with his mother for roughly ten years. *Id.*

- He has passed the written portion of the driver's test, but failed the driving portion because his "mind was racing and [he] missed a couple signs[.]" (Tr. 47.) His mother drives him everywhere he needs to go. *Id.*  Public transportation is not a viable alternative for him since he lives in a rural area. (Tr. 48.)

- He has been smoking since he was 18 years old and smokes about a half-pack per day. He drinks alcohol twice a year at parties or family gatherings. *Id.*  He used marijuana once a week, but stopped two months ago. (Tr. 48-50.)

- He has been convicted of one misdemeanor for unruly conduct in January of 2011 arising from a family disagreement. He served one night in jail. (Tr. 51.)

- He is currently prescribed Anafranil to treat his obsessive compulsive disorder ("OCD") and bipolar disorder and Ritalin to treat his attention deficit hyperactivity disorder ("ADHD"). (Tr. 52-53.) He denied any side effects. (Tr. 54.)

- He has had back and knee problems since he was 15 when he sustained a slip and fall injury. *Id.*  His knee requires surgical repair, but he will not be able to undergo the operation until he loses weight. *Id.*  He underwent a discectomy of his back a few years ago. *Id.*  The surgery helped alleviate his back symptoms, but they have recently resurfaced. (Tr. 54-55.) He has lost most feeling in his left leg and experiences stabbing pain. (Tr. 55.) He has been prescribed a walker for days when his symptoms are especially problematic. *Id.*

- He has received "many epidurals" in his back, one of which led to an inflammation of the sciatic nerve that required emergency surgery to correct. (Tr.

---

[1] Kincaid asserts that he held such a position for only a short period of time and that his earnings did not constitute substantial gainful activity. (ECF No. 14 at 3.) Therefore, he disputes that said work qualifies as past relevant work. *Id*.  In any event, the dispute is immaterial as the ALJ found Kincaid's residual functional capacity precluded such work. (Tr. 19.)

> 56-57.)
>
> • He can stand or walk for about half an hour before having to sit down and take a break. *Id.* In an eight hour work day, he estimates he could probably be on his feet for three to four hours total. (Tr. 57-58.)
>
> • He can lift five to ten pounds regularly. (Tr. 58.)
>
> • He can sit for an hour or two before having to get up and take a break. (Tr. 58.) He estimates he could probably be in a seated position for five to six hours out of an eight hour work day. *Id.*
>
> • He has been treated for mental issues "[his] whole life, basically." (Tr. 59.) He has never been admitted to a mental hospital, but has received treatment for panic attacks at Marion General Hospital. (Tr. 59-60.)
>
> • When asked to describe a typical day, Kincaid stated he wakes up between 7:00 a.m. and 2:00 p.m. (Tr. 60.) He is able to take care of his own personal hygiene. *Id.* When he is able to, he helps his mother with chores around the house including cleaning dishes and occasionally cooking "very quick meals." (Tr. 60-63.) He does not do laundry, vacuum, mop, or sweep. *Id.* He spends about two hours per day on his computer, which he uses mainly to socialize with his distant family on Facebook. (Tr. 62.) He also plays his Xbox for approximately one hour per night. *Id.* He does not have any other hobbies. *Id.* For the most part, he only leaves home to attend doctor's appointments. (Tr. 63.) He goes to bed between 10 p.m. and 5 a.m. *Id.*

The ALJ posed the following hypothetical question to the VE:

> Assuming that we have a person with the claimant's age, education, and past work history just identified, and having the physical limitations, I'm looking specifically at exhibit C-10F, consistent with the [state] agency, indicating that he can lift 20 pounds occasionally, 10 pounds frequently, sit about six hours, stand and walk about six hours in an eight-hour day, he can occasionally climb stairs, he's precluded from ladders, ropes, scaffoldings, he can frequently balance, stoop, kneel, crouch, and crawl, and [he should avoid concentrated exposure to heights and dangerous machinery.]

(Tr. 68.) The VE testified such an individual could perform Kincaid's past relevant work, as well a full range of unskilled light work. *Id.* The ALJ posed a second hypothetical adding the following psychological limitations:

> [A]llowing for ... simple, repetitive tasks, he should have limited contact with the public – or a limited number of people that he should have contact with, a stable work environment, moderate pace, and low-stress work – things that are defined as no strict production quotas, or time pressures.

(Tr. 69-70.) The VE testified such an individual could not perform Kincaid's past relevant work. (Tr. 70.) However, the VE stated such an individual could perform approximately 45 percent of unskilled light work and identified the following representative examples of jobs such an

3

individual could perform: Janitorial Cleaner, Housekeeping/Cleaner, Dishwasher, and Packager. (Tr. 71.) The ALJ then posed a third hypothetical question, this time adding the psychological limitations from the evaluation of T. Rodney Swearingen, Ph. D.:

> [Assume the individual] can understand, remember, and follow simple, repetitive tasks, that detailed or complex tasks he might only be able to do occasionally. There is ... an ability to do frequent concentration, [attention], persistence, and pace, and interaction is limited to no more than occasional, and again, we're looking at low-stress work with no strict production quotas and time pressures.

(Tr. 72.) The VE testified such an individual could not perform Kincaid's past work. *Id.* However, the VE stated such an individual could still perform 45 percent of unskilled light work as in the previous hypothetical, to include the specific jobs previously identified. *Id.* Finally, the ALJ asked the VE whether an individual with the symptoms Kincaid testified to could do his past work or any other work. (Tr. 73.) The VE testified such an individual would be unable to do Kincaid's past work or any other work due to problems associated with anxiety, racing thoughts, and back pain. *Id.*

***Relevant Medical Evidence***

Prior to the alleged onset date, Kincaid's history of psychological issues has been documented since 2004. Records show he experienced overwhelming anxiety and severe separation issues regarding his mother.[2] (Tr. 329.) In September of 2004, Kincaid was noted as spending most of the day "consumed by compulsions of touching things and doings things the right way." *Id.*

Kincaid began treating with Jeffery Spencer, M.D., on September 11, 2009. (Tr. 277.) On October 21, 2009, Dr. Spencer completed a social security questionnaire and stated that Kincaid "cannot really tolerate any stress ... [or] interpersonal situations, cannot sit still long enough to do any meaningful work, cannot tolerate structure of a workplace environment, [and] obsessions dominate his sensorium at all waking times.... I do not think they can be eliminated." (Tr. 279.) Dr. Spencer believed "there are congenital malformations in [the] brain, personality, affect, ability

---

[2] Treating physician Jeffery Spencer, M.D., states in one of his reports that Kincaid's symptoms first began manifesting themselves when he was only six years old. (Tr. 279.)

4

to use executive functioning, and so forth which have been present since the beginning." *Id.* Dr. Spencer diagnosed Kincaid with severe generalized anxiety disorder, severe OCD, ADHD not easily controlled, depression, and a number of physical impairments. *Id.*

On October 27, 2009, Kincaid reported to T. Rodney Swearingen, Ph.D., for a consultative examination. (Tr. 281.) On mental status examination, Dr. Swearingen reported that Kincaid was cooperative and open throughout the evaluation without eccentricities of manner or impulsive behaviors. (Tr. 282.) His speech was intelligible and understandable without an apparent flight of ideas. *Id.* He was an average historian. *Id.* However, Dr. Swearingen noted inconsistent eye contact, reactive affect with mildly anxious qualities. *Id.* Kincaid reported that he becomes nervous or anxious "at anything," but denied panic or anxiety attacks. (Tr. 283.) Dr. Swearingern noted no evidence of hallucinations, delusions, paranoia, dissociative experiences, or recurrent recollections of a traumatic event or somatic concerns. *Id.* Kincaid was alert and responsive; oriented to time, person, and place; his concentration and persistence were good; and, he had no difficulty understanding or following instructions. *Id.* He had no impairment in regard to his insight or judgment. *Id.* Dr. Swearingen also noted Kincaid "worries a lot about germs." *Id.* The diagnosis included OCD and depressive disorder not otherwise specified. (Tr. 284.) Dr. Swearingen noted that Kincaid's most serious mental symptom was his depression and anxiety, which significantly impairs his occupational functioning. *Id.* He also assigned Kincaid a Global Assessment of Functioning ("GAF") score of 58.[3] Dr. Swearingen found Kincaid was moderately impaired in his ability to relate to others and to withstand the stress and pressures associated with daily work. (Tr. 284-85.) He found mild impairment in Kincaid's ability to understand,

---

[3] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0 - 100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See DSM-IV* at 34. It bears noting, however, that a recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

remember and follow instructions, and in his ability to maintain attention, concentration, persistence and pace. *Id*. Kincaid's ability to manage his funds was unimpaired. (Tr. 285.)

On November 24, 2009, Kincaid presented to Dr. Spencer complaining of a "series of panic attacks." (Tr. 299.) He also discussed his phobia of taking his medications.[4] (Tr. 300.)

On January 5, 2010, Dr. Spencer filled out another questionnaire regarding Kincaid's eligibility for SSI. (Tr. 294-96.) Dr. Spencer noted Kincaid had severe OCD and bipolar II disorder, severe and generalized anxiety disorder, and ADHD. (Tr. 295-96.) He indicated Kincaid suffered from "morbid obesity (upper body) abnormal habitus, abnormal facies, congenital problems," and that he "cannot function at all" despite having undergone extensive testing, treatments, and revisions of treatment. (Tr. 295.) Dr. Spencer also opined that Kincaid would be pleasant around co-workers, but would not get any work done as a result of his mental impairments. *Id.* He also stated Kincaid's anxiety and depression were somewhat controlled, but that his OCD was far less controlled. (Tr. 296.) He added that Kincaid had a "very poor and [he] would say minimal tolerance to stress, to changes in the immediate environment, [and] to leaving the home (agoraphobia)." *Id.*

On March 15, 2010, Cynthia Waggoner, Psy.D., completed a Psychiatric Review Technique form. (Tr. 313-326.) She opined Kincaid was markedly limited in his ability to perform activities of daily living; moderately limited in his ability to maintain social functioning as well as in his ability to maintain concentration, persistence, and pace; and had no episodes of decompensation of an extended duration. (Tr. 323.) On the same date, Dr. Waggoner also completed a mental RFC assessment. (Tr. 327-330.) She reported Kincaid as markedly limited in the ability to understand, remember, and carry out detailed instructions; and, the ability to interact appropriately with the general public. (Tr. 327-28.) She assessed moderate limitations in numerous other categories. *Id.* On July 19, 2010, David Deitz, Ph.D., conducted an independent review of the record and affirmed Dr. Waggoner's assessment. (Tr. 381.)

---

[4] In a subsequent visit, Dr. Spencer noted that Kincaid's process of weighing the pros and cons of taking his medication routinely lasts about twenty minutes per pill. (Tr. 295.)

6

In September 2010, Dr. Spencer completed another questionnaire regarding Kincaid's impairments. (Tr. 383-84.) Dr. Spencer essentially echoed his sentiments in the reports from September 2009 and January 2010, opining that Kincaid had "complex psychiatric issues" and was "unable to function much less hold a job." (Tr. 384.) Dr. Spencer also recommended setting up psychiatric and neurological consultations. *Id.*

In March of 2011, after getting into a verbal altercation with his grandmother, Kincaid began attending court-ordered treatment at the Marion Independent Physicians Association with Joseph Spare, M.D. (Tr. 413.) Dr. Spare diagnosed Kincaid with the following: bipolar affective disorder, mixed; ADHD; obsessive-compulsive disorders; impulse control disorder; dependent personality disorder; sleep apnea; and chronic pulmonary obstructive disorder (COPD). (Tr. 415.) Dr. Spare assigned Kincaid a GAF score of 50, noting that Kincaid "has a problem with social environment, criminal, and legal system." *Id.* He further opined Kincaid is able to give informed consent, but unable to handle financial affairs, unable return to usual or part time work, and unable to live independently. *Id.*

### III. Standard for Disability

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201. 416.1201.The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of

7

past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ found Kincaid established medically determinable, severe impairments, due to degenerative disk disease of the lumbar spine with stenosis status post February 2008 hemilaminotomy and diskectomy, chronic obstructive pulmonary disease, asthma, morbid obesity, obsessive compulsive disorder, depressive disorder, bipolar disorder, dependent personality disorder, attention deficit hyperactivity disorder, and impulse control disorder; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 13-14.) Kincaid was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 19.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Kincaid was not disabled. (Tr. 19-20.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also*

*Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

Kincaid raises two arguments in his Brief on the Merits. First, he asserts the ALJ erred by failing to properly evaluate the medical opinions of his treating physician, Dr. Spencer, as well as the opinions of consultative physicians Drs. Spare and Waggoner. In the second, Kincaid argues the RFC was not supported by substantial evidence, especially in light of his well-

documented germ phobia.  (Doc. No. 14 at 9-13.)

*Treating Physician*

Kincaid asserts the ALJ failed to properly consider the opinion of his treating physician, Dr. Spencer.  (Doc. No. 14 at 11.)  Specifically, Kincaid argues the ALJ's stated reason for rejecting significant portions of Dr. Spencer's opinion – that it was not well supported by nor consistent with the record as a whole – is a "completely fabricated answer" in light of the extensive history of severe mental issues contained in the medical records.  *Id*.  The Commissioner argues that the ALJ conducted a proper analysis of the medical opinion evidence under the regulations, and that her analysis is supported by substantial evidence, noting "Dr. Spencer's disability opinion was neither supported by nor consistent with the totality of the evidence[.]" (Doc. No. 15 at 18.)  In support of her position, the Commissioner points out that Kincaid only reported to Dr. Spencer five times and that Dr. Spencer mainly treated him for physical ailments and did not document any specific mental findings.  *Id.* at 20.  The Commissioner also references the ALJ's observation that Dr. Spencer's opinion conflicted with other objective medical evidence in the record.  *Id.*

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006); 20 C.F.R. § 416.927(c)(2).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all

of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 416.927(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Dr. Spencer completed three reports regarding Kincaid's mental abilities and limitations. (Tr. 277-80, 295-96, 383-384.) Specifically, in October of 2009, Dr. Spencer noted that Kincaid "cannot really tolerate any stress; cannot tolerate interpersonal situations, cannot sit still long

---

[5] Pursuant to 20 C.F.R. § 416.927(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

11

enough to do any meaningful work; cannot tolerate structure of a workplace environment; [and] obsessions dominate his sensorium at all waking times ... these will be challenging to control ... I do not think they can be eliminated." (Tr. 279.)  He also noted that Kincaid "is deeply impaired," "is not improving," and that he "cannot see this young man working at any job, full-time or part-time, in the future." (Tr. 278-279.)  In January of 2010, Dr. Spencer documented impaired memory deficits, abnormal affect, mood swings, daily episodes of anxiety, and severe OCD.  (Tr. 295-96.)  He opined that Kincaid's ability to tolerate stress and workplace stressors was "very poor" and that he had minimal tolerance for changes in his immediate environment.  (Tr. 296.)  Similarly, in September of 2010, Dr. Spencer stated Kincaid "is unable to function much less hold a job" and "can barely take care of [activities of daily living]." (Tr. 384.)

After briefly referencing two questionnaires completed by Dr. Spencer, the ALJ stated as follows:

> These mental assessments have been considered and to any extent that these could be viewed as suggestive of limitations greater than those included in the above-stated [RFC], they are granted **very little weight** as they are not well-supported by nor consistent with the record as a whole, most particularly that the treating physician's own treatment notes, the findings of the consultative examining psychologist, and the opinions of State agency psychological consultants (Exhibits C6F, C9F, C12F, C15F and C19F).

(Tr. 18-19) (emphasis added).

Although the ALJ correctly identified Dr. Spencer as Kincaid's treating physician, the ALJ failed to provide good reasons for rejecting a majority of the mental limitations he assessed.  Without any meaningful analysis or discussion, the ALJ offered three reasons for effectively rejecting Dr. Spencer's opinion: (1) it was not well supported by the record as a whole; (2) it was inconsistent with Dr. Spencer's own treatment notes; and, (3) it was inconsistent with the consultative and state agency physicians' opinions.  *Id.*

The ALJ's first reason for rejecting Dr. Spencer's opinion, that it is "not well supported by the record as a whole," is conclusory and devoid of explanation, thus depriving this Court of the ability to conduct a meaningful review.  The ALJ failed to reference specific facts in the record that were ostensibly inconsistent with Dr. Spencer's opinion.  Accordingly, this Court cannot accept the ALJ's blanket assertion that Dr. Spencer's opinion was not well supported by

12

the record as a whole as a good reason for rejection.

Second, the ALJ asserted that Dr. Spencer's medical opinion was contradicted by his own treatment notes. (Tr. 18.) Again, the ALJ failed to identify any specific treatment notes from Dr. Spencer that allegedly conflict with his opinion of Kincaid's mental abilities. Accordingly, the ALJ's second reason for assigning "very little weight" to Dr. Spencer's opinion is not well taken.

Finally, the ALJ noted that Dr. Spencer's opinion was inconsistent with the opinions of consultative examining psychologist Dr. Swearingen and State agency psychological consultants Drs. Waggoner and Deitz. (Tr. 18-19.) The ALJ assigned "great weight" to these opinions, because they were "consistent with the record as a whole."[6] (Tr. 18) However, these opinions do not constitute "good reasons" for rejecting a treating physician's assessment. This Court has previously ruled that an ALJ cannot base his or her rejection of a treating physician's opinion upon its inconsistency with the opinions of non-treating physicians. *See Brewer v. Astrue*, 2011 U.S. Dist. LEXIS 64262, 2011 WL 2461341 at *7 (N.D. Ohio Jun. 17, 2011) ("To do so would turn the treating physician rule on its head [as] [i]t is well established that the opinions of non-examining physicians carry little weight when they are contrary to the opinion of a treating physician."), *citing Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) (finding that the opinion of a non-examining physician "cannot provide a sufficient basis for rejecting the opinions of plaintiff's treating physicians"); *Fife v. Heckler*, 767 F.2d 1427, 1431 (9th Cir. 1985) ("If the ALJ wishes to disregard the opinion of the treating physician, he must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record, even where the treating physician's opinion is controverted by the Secretary's consultant.") As recently explained by the Sixth Circuit Court of Appeals:

> Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the

---

[6] It is worth noting that while assigning "great weight" to Dr. Waggoner's opinion, the ALJ failed to give effect to her assessment that Kincaid has marked limitations in his daily living activities. (Tr. 323.) In fact, the ALJ explicitly states that the claimant's activities of daily living "tend to belie his allegations as to difficulty concentrating." (Tr. 18.)

13

> treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th 2013).

Accordingly, inconsistencies with the opinions of nontreating physicians Drs. Swearingen, Waggoner do not constitute "good reasons" for rejecting the opinion of a treating source.

The Commissioner raises several arguments regarding purported inconsistencies between Dr. Spencer's opinion and treatment notes in support of the ALJ's decision to assign "very little weight" to Dr. Spencer's opinion.[7] However, the ALJ does not raise any of these issues in her decision. Accordingly, these arguments constitute *post hoc* rationale that this Court cannot rely on to supplement the reasoning set forth in the ALJ's brief. *See, e.g., Bable v. Astrue,* 2007 U.S. Dist. LEXIS 83635, 27-28 (N.D. Ohio, Oct. 31, 2007) (*citing NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 715, n. 1, 121 S.Ct. 1861, 149 L.Ed.2d 939, (2001)); *Sarchet v. Chater,* 1113 (6th Cir. 1986) (rejecting Defendant's *post hoc* rationale that obesity is *per se* remediable where there was no factual basis or findings of fact in the record to support such an argument).

The Court finds the ALJ failed to provide "good reasons" for according "very little weight" to Dr. Spencer's assessments. The Court further finds a remand is necessary to afford the ALJ an opportunity to sufficiently evaluate and explain the weight ascribed. Furthermore, as the RFC determination may well change given further evaluation of Dr. Spencer's opinion, the Court declines to address whether it was supported by substantial evidence.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision should be VACATED and the case

---

[7] In her brief, the Commisioner argues Kincaid only visited with Dr. Spencer five times, asserts that Dr. Spencer treated Kincaid primarily for his physical conditions, and alleges that Dr. Spencer was "intent on assisting [Kincaid] in his effort to obtain disability benefits." (Doc. No. 15 at 6, 20.)

REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four for further proceedings consistent with this Report and Recommendation.

s/ Greg White<br>United States Magistrate Judge

Date: June 27, 2014

### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**